The next matter is in re Marriage of Agee v. James Agee. Mr. Groshong and Ms. Shaw. Be seated. Oh, you want a black one? I don't care. It's just that one. Oh, okay. Just give us a moment. I don't care. Sir. It was just out. Thank you. Thank you. Mr. Groshong. This is for counsel. I'm Donald Groshong from Alton. I represent Mr. Agee in this post-divorce matter, in which there is not only an appeal, but a cross-appeal that resulted from the judgment in Everettsville. The standard of review is abuse of discretion manifests way to the evidence. The issues here are four, essentially, two of which both parties join and in which we use reverse because they are property and debt distribution and child support calculation. And then, for my side of the case, we ask you also to reverse for your colleagues on child custody. My opponent asks the same on her issue as the priest's contribution. So, really, four issues that I ask for your attention. The singular most pervasive issue in this case really relates to an interspousal tort. Interspousal what? It's an interspousal tort. It really permeates the case. It affects all the issues. It relates to an occurrence on November 1, 2011, where the spouse, the female, who is the appellee here, is supposed to have struck the husband with the car, and he was injured, and as a result of this, he had a collateral tort case that was pending, which was resolved after the divorce case was finalized. Let me ask a question about the timing of that, if I can. When you say after it was finalized, had the trial judge entered the decision before it was settled? Yes, she did. Okay, so the judgment had already been entered. She had a post-trial motion before it had been filed by my opponent asking her to reopen the case because there was a settlement of this tort case. Okay. So that's what I want to find out. I mean, the trial ended. The judge took it under advisement. And then she ruled after that. Okay. Then there was a post-trial motion saying, wait a minute, something's happened here, he's got money, you know, through some kind of a settlement, and there were no further hearings, then the judge entered judgment. That's correct. Right. In that judgment, did the trial court classify that settlement as either marital or non-marital property? She didn't really classify it. What she said was normally I would reserve ruling on this. She called it a post-separation. Yeah, but she said I'd normally do that so I could figure out how much the wife would get. But then she said because it was a post-judgment matter, post-separation, and because she had him, I'll just go ahead and award her. What she didn't look at was that there is a statute, 50385, which talks about this being judgments that are interspousal judgments are non-marital. So this would have been a non-marital matter anyway, except for the proviso that it was resolved by settlement rather than by judgment. Well, yeah. I mean, your opponent says, wait a minute, there's no judgment here. That's what the statute says. That's a matter that you should review de novo. But here's my question. Whether something happened post-separation doesn't have anything to do with whether it's marital or non-marital, does it? I'm sorry? Something coming in post-separation doesn't define whether something's marital or non-marital, does it? I mean, property acquired after the day of marriage and before the entry of judgment is marital generally, unless acquired by certain ways. Do you agree with that? I'm having trouble hearing. I'm sorry. I'm over-hearing you. Okay. That's fine. Well, what I'm getting at is wasn't the trial court required to determine whether or not this settlement was marital or non-marital and take that decision into consideration in dividing marital property? It wasn't a matter that was presented during the trial. It came in late. There was testimony there was a claim, though, right? That's true. There was testimony that there was a claim, but it hadn't been settled yet. And there was paperwork filed by my opponent that said the case had been settled. There was a $62,000-plus gross settlement. And so that issue and the numbers were in front of the court. It just didn't reopen the case. Now, whether she took that into consideration or not, I can't tell you because she didn't say one way or the other in her judgment. But what she did do was she ruled on everything else in the case, and she certainly would have been aware of it because it was before her. It's just the same judge that had everything throughout the whole case. She heard everything from day one throughout. The interesting thing is, see, the statute does say that judgment would be non-marital, but it doesn't say anything about the settlement. And, of course, there's no real difference if you look at the underlying operative events. One party injures the other party. It would appear, although I couldn't find a case that says any of this, that the intent of the legislature doing this is once we've eliminated interspousal court immunity, what we're going to do is we're not going to let the person profit by their own wrongdoing. If the spouse has done something to the other one, gets a judgment or, like I say, a settlement as well, that's going to be their non-marital asset. It's nice to be able to argue about that here in the appellate court, but none of that was ever resolved in the trial court about profiting by your own wrongdoing. I mean, you're here saying, you know, wait a minute, you can't award 20 percent child support out of that settlement. We never got a chance to put on evidence about how much of it was for this or that or whatever. They're saying, wait a minute, you can't just give him this whole settlement because we never got a chance to put on evidence about, you know, whether it's marital or non-marital. You're both kind of complaining about that. We are both complaining for different reasons. You're right. From my point of view, it is pretty clear you shouldn't, based on public policy, you should not be able to profit by your own wrongdoing. And there's a nice line of cases I cite for you, State of Vermont and Davis and some others, which really talk about that, that you can't profit by your own wrongdoing. And so if you look at that principle here, then you wouldn't allow the award to go to her as child support any part of it because that would profit her by her own wrongdoing. Well, isn't it for the child? Well, Davis is the case. You've got that. That's the Dramshot case. And the Dramshot case makes it clear. And that's the same kind of circumstance where you're talking about complicity, that you can't profit by your wrongdoing, nor can you have a claim for support. And they specifically deny a claim for support. So by analogy, I think that that same logic holds true here. But, you know, you're right. The question is, what does this same tort have to do? How does it affect the overall result? The answer is it should be it's a non-marital result. Whether it's, from my point of view, whether it's a judgment or whether it's a settlement, it's not income. And the reason it's not income is the line of cases that Brown and Davis, where you can't factor it as income because she can't profit by her own wrongdoing. But that same logic makes me examine, again, custody and other things because, again, she profits by her own wrongdoing there. This trial court denied custody in great part saying, I've gone through the factors, you know, and the factors in 6038A, and I have all these factors. Many of those factors relate to this interspousal tort because they actually, even though Mrs. Agee denied hitting him, some insurance company paid him $62,000 to go away. So they at least felt there was the potential for liability to pay up this money. Now, I don't know how much of it was net because we don't know that from the record. I didn't try this case in the trial court, so I don't really know the answer. But we know that Mr. Agee said he had $40,000 in medical. We know that there would have been a percentage, you know, normally to the lawyer that represented him. So with those kind of numbers, somebody would have been pretty paltry. Some of you would have ended up with net if those numbers are correct. I don't know if those are correct or not. But the fact of the interspousal tort is not factored in by the trial judge to the issue of custody at all. She just kind of pretends like it didn't happen. As a matter of fact, it seems to be an afterthought in the judgment to award a percentage as child support. But the actual, if you look at the factors like physical violence and those kind of things in the child custody statute, that's a pretty big factor. The trial judge heard evidence about this thing, so she knew about it. I mean, there was considerable evidence. We had the police officer testify and some others, and the neighbor whose credibility was questioned. But the basic fact is the guy had knee surgery and was off work because of this. Well, that's not factored into his ability to prevent. He's not working, but one of the reasons is his wife ran into him in the car. And he's ultimately ordered to pay all kinds of things that it's pretty obvious he's not going to be able to pay. The court seems to have taken an arbitrary $37,000 20-kin gross income number and used that as his income, although it doesn't seem that she applied any of the factors that you're supposed to in paying off the taxes and whatnot, and especially payment of prior obligations to another woman, which were admitted, which she intentionally didn't do. So it's very difficult looking at the record to figure out where the trial judge came up with his income number. She obviously didn't factor in he's off work because he's injured, some of which is the other person's fault. Didn't she find that he was voluntarily unemployed? Well, they allege that, and there's no evidence that he's voluntarily unemployed. We know he was injured. Before he was injured, he wasn't working. Before that, he was already off work on an approved leave of absence from his place of employment for medical reasons. And he didn't go back when he was released? There was testimony that there were a couple of months he went back to work because they were talking about using childcare facilities, and he'd gone back to work for a couple of months, and then he got hit with the car, and he's off again. And then we ran out of the record after that. Didn't he testify that he had some kind of plan to sell insurance, that he pretty much candidly admitted that, but I don't want to start doing that yet because I don't want my wife to get any of the money. You're exactly right. I mean, that's voluntarily unemployed, isn't it? He sat down. So, I mean, we'll count that as one of the reasons. But on the other hand, I don't know if he's even able to because he was hit with a car, and he's got to be here. The evidence also had a history of violence by your client. His history of violence is twofold. One is prior girlfriends, which I consider to be irrelevant to this under the guidelines of the statute. Even if you knock them around? They're remote. They don't affect this child in any way. And one of the two instances was really more of a drunken sexual situation, frankly, than abuse. I guess that could be abuse too. But anyway, the factors in relation to the other women I don't think were really particularly relevant to this situation. The record shows this guy was a good father and a tender father for this child, and no one ever said he ever did anything other than be a good father and be good with children. The evidence was that he had held the wife by the elbow, and he twisted her arm, and he had caused a bruise and that kind of thing. And there were bad people who called her bad names and that kind of thing. That's true. There's plenty of references to that. Didn't he secretly record the child? Pardon me? Did he secretly record the child? Did he? Secretly record the child? I'm hearing you say that. Was there evidence that he secretly recorded the child? He did that, and that's what the trial judge and the GAL call surreptitious recording. And I give this a lot of thought. Surreptitious, I guess, just means that he didn't tell anybody about it. But, you know, a lot of people do stuff to preserve evidence. There's a specific case I did find I cited to you about exactly that kind of conduct with the GAL, which a trial judge thought was probably something they should do. There's a question about whether or not there's an eavesdropping violation. But on the other hand, you may be preserving evidence we otherwise wouldn't be able to get, which would be highly wrong to a GAL. This GAL only listened to a couple of recordings and didn't listen to the rest of them and then complained that while he didn't say anything bad about the wife, he didn't say anything good either. But, of course, she didn't listen to them also. She kind of jumped across a pretty large span of information without knowing the answer. This issue of surreptitiousness, the trial judge was very offended, disturbed is the word she used by that, and so did the GAL. I think they overreacted to that as a factor in this thing. I don't think that that by itself should have been outcome determinative of custody, I'm sure. The matter is well briefed for you, and I'm running low on time, but I think you've got a very good set of briefs, and I thank you very much. Thank you. Ms. Shaw. Ms. Shaw, may it please the Court. I'm Jennifer Shaw. I represent Shannon A.G., the appellee and the cross-appellant. We defend the trial court's award of sole custody to Shannon as well as the court's imputation of income to Jane for purposes of support. On our cross-appeal, we raised four key issues.  Secondly, the trial court's failure to award a greater share of Shannon's final fees and costs to James. Third, the trial court's failure to allocate marital debt and property in an equitable manner pursuant to statute. And fourth, the trial court's failure to consider and calculate gifts and or loans from James' family in its court determination. We first turned to the trial court's failure to address and or rule on interim fees after it was set for hearing. The court's failure to act was reversible error. A trial court's determination of interim fees is reversible when the reviewing court finds an abuse of discretion, Levinson 2013 ILAP 121696. When recognized principles of law are ignored, a trial court abuses its discretion. Section 102 of the Illinois Marriage and Dissolution of Marriage Act delineates the act's purposes. Subsection 5 specifically cites the timely awards of interim fees to achieve substantial parity and access to funds for litigation as one of the act's purposes. Ms. Trump? Yes. Did the trial court take your request for returning fees as part of the overall hearing? It did not. The record does not reflect how this came to be. Frequently, in these divorce cases, we're doing things in chambers, off the record. And it was understanding of trial counsel that we were taking the issue of final fees and not interim fees with the trial. So only the final fee issue was? Correct. Originally, interim fees were set in August of 2011. The court had everything that it needed to hear the fees. And as this court is well aware, pursuant to Section 501 and 508, the legislature has mandated trial courts to expeditiously schedule non-evidentiary hearings on fees. It's not discretionary. It's mandatory. Statute uses the word shall. And here it was set in August. There was never a ruling. The trial courts have heard, well, it's a non-evidentiary basis. The court had affidavits. The court had a petition. Unlike many divorce cases, there was actually a petition setting forth the fees that had been incurred by the initial counsel for Shannon, as well as our office. Mr. Agee's attorneys had responded with their enumeration of the retainers and the subsequent payments they received. Subsequent counsel advised the court as to their fees that had been received. The court received financial affidavits sworn by each party. It had everything it needed to hear this on a non-evidentiary basis. So what do we do about that? What relief are you asking for on the trial court's failure to act on your interim? Absolutely. I look at this in two ways, and there are two reasons that we're asking for relief. One, in many ways, this is similar to a mental health and voluntary commitment hearing. This is something that comes up all of the time in every courtroom in domestic relations in this state. Petitions for fees are filed. They're never acted upon. And so we are asking this court to say, trial courts, you have to set them. You have to rule on them. You have to give them a thumbs up. You have to give them a thumbs down. You have to do something. In addition, in this case, the record is before this court. There are pending motions to modify in this case. There are pending petitions for contempt in this case. There is a pending petition for fees in this case. We're continuing to incur fees. I anticipate that we are going to continue to argue about this case for a number of months and years to come. We're asking the court not only to say, hey, courts across Illinois, you have to do something, but Madison County, you have to hear interim fees on remand. You have to have a decision on interim fees. Well, I mean, okay, I understand you want precedent. We do. But also, particularly for this case, this is important because in this particular case, we're going to act. I mean, I guess the question is, I mean, how can you prove you've been prejudiced? I mean, the judge took up the issue of attorney's fees at the trial for everything that had happened from the date the case was filed through judgment and made a decision about attorney's fees. Sure. Interim fees are a little bit different feature than final fees. Interim fees are not precedent. I mean, why wouldn't we say it's moot at this point? Okay. For a couple of reasons. And you don't want that precedent, right? Right. A couple of reasons. Number one, Shannon was actually harmed in not having fees ordered to her. One of the things that we complain about in the allocation of final fees is the fact that during trial, we were still getting documents. During trial, there are orders in the midst of our five-day trial that say Janes must produce X documents. Had we had the funds in which to subpoena those records, we would not have been doing that in the middle of trial. Had we had the funds to call in some experts, maybe some of these other issues wouldn't be here. She was substantially prejudiced in that she did not have the same access to funds that Mr. Agee did. We did not learn until two weeks before trial that he had deposited $80,000 into his account in a ten-and-a-half-month period. And so had she had the ability all of this time to send out subpoenas, to take full advantage of the attorney's toolbox, I think that the outcome may have been very different on some of these issues, and that's why she was prejudiced. That leads directly into our discussion of the court's failure to order a greater contribution of final fees to Shannon, and its order is reversible error. There are two ways in which a litigant can overcome the presumption that he or she should pay the fees that he or she incurs in the dissolution. The first is a showing that the litigant is unable to pay the fees, and the other party is so able. And the second is a showing that the party against whom the fees are sought unnecessarily increased the cost of litigation. That's in Ray and the Marriage of Patel, 13LF112571. Well, the judge in this case did address that latter issue that you just raised and awarded $1,200. Which respectfully did not put a dent in the actual cost. Not only the attorney's fees, the cost to obtain those documents by subpoena that our office ultimately had to shoulder was tremendous. So your argument is not that the trial judge failed to address that, that the trial judge's rulings against the manifest way of the evidence were an abuse of discretion because the awards had been more. Absolutely. In fact, my brief takes eight pages to talk about the ways that James acted with unclean hands. This is a fellow who at the beginning of litigation said to Shannon, I will ruin you with my family's superior resources. And that's exactly what he tried to do. He violated multiple court orders on multiple occasions. There was an order that required him to turn over a bill that she was required to pay. He didn't do it. He filed a petition to be sent faxes, and then he had the chutzpah to turn around and file a petition for contempt against her for failing to make the payment in a timely manner when she didn't have the information. He filed frivolous pleadings. After he had filed a motion to continue the trial, he filed a petition for leave to remove, which required additional time for us to prepare a defense to. And he put on less than five pages of testimony in the record. Clearly a frivolous pleading. He had no real plans to remove this child. This is a fellow who at every turn engaged in market gamesmanship designed to frustrate Shannon's ability to present her case. And as you indicate, Justice Stewart, the court did recognize his bad acts, but for multiple discovery violations and for failing to place a tax return in his attorney's trust account as he was supposed to do, for intentionally delaying file, for not showing up on time to a mandatory settlement conference, requiring the judge to get on the phone and say, you have to be here now, the trial court required a substantially larger contribution to fees. In addition, the trial court did not make the correct analysis in determining whether or not Shannon had the ability to pay. The court, pursuant to In re the marriage of Marthins and Patel, has to determine financial inability. You don't have to deplete all of your assets to be financially unable to pay. You also have to look at whether or not payment of fees undermines a party's economic stability and whether it would prevent him or her from supporting the child. And here, Shannon's attorney's fees exceed, at the time after trial, not now, at the time after trial, her fees exceeded her annual salary by $10,000. That was double. Now her outstanding attorney's fees are more than double her yearly salary. Jane's financial affidavit, and his income is shown by the bank statements, show that he has a surplus every month after all of his bills are paid. Shannon's financial affidavit shows that she's in a deficit position. And he's unemployed. And he's unemployed. His family has put, throughout the marriage and after the separation, and we believe, although we have no proof of this at this point to today, we believe that his family puts substantial amounts of money into his account. This is very analogous to Henry, the marriage of Rogers, very analogous to Henry, the marriage of Anderson. We are asking the court to extend the logic in Anderson and Rogers, saying that if it's income for purposes of child support, it would also be income for purposes of other matters in the divorce. So for awarding attorney's fees, foreign property distribution. I noticed in your chart, though, showing the equities in your brief, that you did not include his $58,792.98 that he paid for attorney's fees. Those have already been paid. All of those have been paid. You included hers. I did. Hers were alone. And that is the reason that they were included. He testified that he had brief testimony that his fees were alone. From his parents. From his parents and from his grandmother. However, under, just a moment, the court should be looking at transfers between parents and children with a very skeptical eye. And when we start to look at presumptions of gifts, and we start to talk about Henry, the marriage of Juan Street, that's a situation where there is a presumption that money transferred between a parent and a child is a gift. To overcome the presumption of a gift and not a loan, one has to evidence repayment or repayment plan. There is no such evidence in the record. Mr. Agee's own financial statement shows that he has no outstanding loans. He had every opportunity to amend his financial statement through trial and never did so. Ms. Agee, however, did list her loans. She also listed a repayment schedule and attached into our brief our cancel checks of the payments that she is making towards her loan. That is the reason we did not include it. It's because we believe it's a gift and not an actual debt of marriage. On your petition for interim fees under the newest case of early line, does it matter if it's a gift, a loan, marital, non-marital? That's a very interesting question and something that I've been struggling with. I think that under the new case of early line, which is something that I had intended on talking about, I think it's something that the court has to consider. Early line doesn't say whether it's marital or non-marital. It just says it's there for spending and it's available for disgorgement. In fact, it says in early line it was non-marital. It was parents and spouse. Exactly. I think that in this particular set of circumstances, given the history of consistent gifts, and there is testimony in the record from James, James' grandmother, James' mother, and Shannon about all the different things that this family had given to the parties, to James before the marriage, to James after the separation. This is a longstanding way of living. James lives through his parents and through his family, and that is something that happened before the marriage and will continue to happen after the marriage. Your time is running short, and I want to ask you a question about the insurance settlement. Absolutely. Whatever you want to call it. What's troubling, just to get to the point, what's troubling me about that is that the court never took evidence. I mean, you filed something and said he got $62,000, I guess, but, you know, there was never an evidentiary hearing. Absolutely. The court never classified it as marital or non-marital. This is a pretty substantial asset in the scheme of things here. So, I mean, you know, why shouldn't we vacate the entire property distribution and send it back to be redone based on nothing being considered on that? A couple of things. Number one, I agree with you wholeheartedly, which is why we filed what we filed. As I'm sure the record is very clear, we tried very hard to get this back before the court. We agree. I think my opponent and I both agree. The procedure on this matter is substantially flawed. The court should have reopened evidence. The court should have required discovery to be reopened. We don't know if this is the totality of the settlement. This is the only document that we have. We don't know what was paid out. I agree with you, Your Honor. I think the entire property division is subject to scrutiny based upon the fact that quite likely the largest marital or non-marital asset was not valued and was not addressed. Thank you. Mr. Garshon, rebuttal? I'm going to speak to the Geico money, we'll call it. This is inter-spousal court settlement. I know that there is concern that the trial judge didn't specifically deal with that, decide whether that's marital or non-marital. I would urge you to look at it de novo under, I think, Rule 366, that you have the power to do things like that here. I hope I got that right. Well, the problem is, I mean, there are numerous cases that say if the trial court failed to consider some major asset in the marriage, that that may affect the entire property distribution, therefore it's all vacated and sent back. I mean, we don't know what the trial judge would have done if she'd have actually considered it. We don't know if she considered it. She had information in pleadings. We don't know. Well, she was aware of it. Yeah. Certainly. It was in the judgment. I understand your concern. The reason I think you should rule de novo is if you don't and you send it back, whatever she does, we'll be back here again. And you can settle it right here. Well, it looks like these litigants are going to fight until they both run out of money and all their family and everybody else, you know. If it is, in fact, non-marital from the property point of view, which I assert it is, and if it is not income, then it wouldn't have an effect on the overall settlement of anything else, other than the argument that the trial court could take into account when they distribute the marital property, we could take into account how the non-marital things were distributed. If you assume it was non-marital, it's gone. He gets it. But even then, to consider it as part of the marital distribution is to give her again the problem. She profits by her own home doings again. Well, here's the thing. The trial court may have divided everything in this case based on a belief that your client had $60,000 cash in the bank, when perhaps, as you point out, if he had $40,000 in medical bills, had to pay attorney fees and so forth, maybe he had zero. We don't know. But there was never any hearing to determine that. And, you know, on the other hand, it could have gone the other way. But that's the troubling thing about it is we just don't know. Well, see, that affects so many other issues, doesn't it? It's not just like one thing in isolation. Right. Obviously, it affects custody. It affects what's his income level and a whole bunch of things. And that's what the problem is. As I said, November 1, the wreck permeates everything else, and it really does. One of the things that was argued at great length is whether or not family money is a gift or is a loan. And you see that quite a bit through the briefs. Both sides of the case, the families provided large amounts of money to him. The case law seems to say if it's a parental gift, you know, we presume that it's going to be a gift if it's parental money. But it doesn't talk about other close relatives. There doesn't seem to be much of a reason for that distinction. But then you've got the presumption of marital property, and they cancel each other out. So it leaves the trial court in a position where they can kind of do what they want with it once they hear the evidence, as long as it's based on the evidence. Here, neither side had a promissory note. And only on Mr. Agee's side was there testimony that this was a loan outside the parties themselves. So it would seem that it's stronger from his point of view than it is actually from hers. But neither one of these people got to have this money that was from the family members. It came enriched by a third of their pocket. I mean, it all went to lawyers and court costs. And specifically here, he paid about ten times the amount of money she did for his guardian ad litem. If you pay $10,000 to a GAL, the trial court ordered him to pay 80% of the fee. So when we talk about the issue of whether the trial court considered the attorney's fees in contribution, if you look at the overall record of the division of property, as you pointed out, if he gets a zero, then he's really gotten the lion's share of the debt here. And maybe that's what the trial court decided to do in allocating issues of money, attorney's fees in contribution. It looks to me like the issue of contribution was taken with the case. And so was the issue of the interim fees. And you can do that because she certainly considered it. Thank you. Thank you. This matter will be taken under advisement and opinion issue in due course. At this point, we'll take a brief break.